UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELDY SMITH and
MARY ROWAN, as full conservator,

       Plaintiffs,

                                  Case No. 19-cv-10103

v.                               Honorable Linda V. Parker

DEWAYNE JONES, CITY OF DETROIT,
and STACEY TAYLOR,

       Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 130 & 146)

Sheldy Smith and Mary Rowan, as Ms. Smith's conservator, filed this action against Defendants, claiming violations of Ms. Smith's federal civil rights and state law arising from an incident on August 1, 2018. Defendants are Detroit Police Department ("DPD") Corporal DeWayne Jones and Officer Stacey Taylor and the City of Detroit.

In an Amended Complaint, Plaintiffs allege the following claims: (I) wrongful seizure and excessive force in violation of the Fourth Amendment and retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983 against Corporal Jones and Officer Taylor (collectively "Officers"); (II) municipal liability for the asserted constitutional violations against the City of Detroit; (III)

1

assault and battery against the Officers; (IV) intentional infliction of emotional distress ("IIED") against the Officers; (V) gross negligence against the Officers; and (VI) violations of Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA") against Defendants.  (ECF No. 4.)

Corporal Jones has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 with respect to Plaintiffs' claims (ECF No. 130), as have Officer Taylor and the City of Detroit (ECF No. 146).  Corporal Jones' motion is fully briefed.  (ECF Nos. 137, 143.)  Plaintiffs filed a response to Officer Taylor and the City of Detroit's motion.  (ECF No. 150.)  No reply was filed.  In their response briefs, Plaintiffs stipulate to the dismissal of their PWDCRA and IIED claims.  (*See* ECF No. 137 at PageID. 2192; ECF No. 150 at PageID. 2584.) For the reasons that follow, the Court concludes that Defendants are entitled to summary judgment with respect to Plaintiffs' remaining claims.

## I.     Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time

for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"'There is, however, an added wrinkle' where the record contains 'a videotape capturing the events in question.'" *Shumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). As the Sixth Circuit summarized in *Shumate*:

> Because facts must be viewed in the light most favorable to the non-moving party only if there is a genuine dispute as to those facts, we may not adopt a version of the facts that is blatantly contradicted by video footage that is not doctored or altered in any way and which

clearly depicts the events that actually happened.  But we must
nonetheless view any relevant gaps or uncertainties left by the video[]
in the light most favorable to the Plaintiff, and must also make all
reasonable inferences in [the Plaintiff's] favor when undertaking the
qualified immunity analysis on summary judgment.

*Id.* at 438 (cleaned up).  Thus, if a reasonable juror could view the events depicted

in a video only one way, that version of the facts must be accepted for purposes of

resolving a summary judgment motion.  *See Latits v. Phillips*, 878 F.3d 541, 547

(6th Cir. 2017) (citing *Harris*, 550 U.S. at 380).  On the other hand, if a reasonable

jury could interpret the events shown in the video multiple ways or if the video

does not show all relevant facts, such facts must be viewed in a light most

favorable to the non-moving party.  *Id*. (citing *Godawa v. Byrd*, 798 F.3d 457, 463

(6th Cir. 2015)).

## II.    Factual Background

At 6:50 p.m. on August 1, 2018, Corporal Jones and Officer Taylor, who

were working as partners at the time, were dispatched to Brainard and Trumbull

Streets in the City of Detroit to respond to a report of "lewd and lascivious in

progress."  (ECF No. 130-2.)  Body cameras worn by the Officers began recording

before they arrived at the scene and captured what transpired thereafter.[1]  As

reflected in the video recordings, Ms. Smith was standing in the intersection of

---

[1] Unless noted otherwise, the description of the events provided herein are gleaned
from the video recordings from the Officers' body cameras.

4

Brainard and Trumbull, fully unclothed.  Ms. Smith suffers from schizophrenia and affective disorder with paranoid delusions.  (*See* ECF No. 130-11.)

The Officers exited their patrol car, Corporal Jones from the driver's side and Officer Taylor from the passenger side.  They slowly walked towards Ms. Smith but stopped several feet away.  They did not say anything to Ms. Smith, who immediately exclaimed to the Officers:  "I love you guys so much.  Ya'll are ministers of god.  I did this to get ya'll here.  I love y'all so much.  I took my clothes off just to see you.  I knew ya'll were coming."  Concluding that Ms. Smith was experiencing a mental health crisis, the Officers intended to transport her to Detroit Receiving Hospital's Crisis Center.  (ECF No. 130-2.)  Corporal Jones opened the back door of the patrol car, and told Ms. Smith, "We'll get you some clothes."  Ms. Smith responded, "Yes sir, daddy.  Yes sir, daddy," and she entered the patrol car.

The Officers then transported Ms. Smith to Detroit Receiving Hospital ("hospital").  As can be heard from the video recordings from the Officers' body cameras, as well as from the patrol car's backseat video camera, Ms. Smith talked to herself non-stop during the ride to the hospital.  The Officers did not engage with her.  About six minutes after initially encountering Ms. Smith, the Officers arrived at the hospital.

Upon their arrival, Corporal Jones first went inside the reception area to retrieve a gown or sheet for Ms. Smith to cover herself. When Corporal Jones returned to the patrol car, carrying a sheet, he opened the rear door for Ms. Smith and, after Ms. Smith stepped out, put the sheet over her shoulders. Corporal Jones then walked inside with Ms. Smith, while Officer Taylor went to park the patrol car.

Mindy Drain, a Crisis Center nurse, and Rebecca Means, a reception aide, were sitting at the reception desk when Corporal Jones and Ms. Smith entered the Crisis Center. Ms. Smith was directed to a chair behind the reception desk; and, after she sat down, Nurse Drain asked Ms. Smith some questions and began checking her vitals. When asked her name, Ms. Smith said it was Sameka Hollis, and she provided a birth date that was not accurate. While she politely responded to Nurse Drain, Ms. Smith "spewed invective"—as Plaintiffs accurately describe (ECF No. 137 at PageID. 2203)—elsewhere.

Ms. Smith's "tirade" (again, Plaintiffs' description) included comments like "I'm going to grich your butch ass . . . put that bitch in hell . . . I will be Satan." She spoke of Lucifer and hell,  She threatened to "kick his ass" and "beat your mother fuckin' ass."

Plaintiffs claim Ms. Smith's verbal tirade was directed at Corporal Jones, although he clearly was not the target of all of her statements. Nothing in Ms.

Smith's statements indicated that she was referring to Corporal Jones, and she did not point at Corporal Jones until later.  She did not look primarily at Corporal Jones when speaking.  For several minutes during her rantings, Ms. Smith was looking to her right, toward the wall of a hallway leading away from the reception area, where a different officer was standing.  Corporal Jones, who was standing across the reception area in front of the reception desk, did not respond in any way to Ms. Smith's rant.

About five and a half minutes after the Officers and Ms. Smith arrived at the hospital, Corporal Jones returned to the patrol car to try and identify Ms. Smith based on the information she shared.  Ms. Smith continued to rant for most of the time that Corporal Jones was outside, talking repeatedly about hell and that she had come from hell and saying "fuck you" to various people in the reception area.  About eight minutes after he left, Corporal Jones returned and directed Officer Taylor to ask Ms. Smith for her phone number.

As Officer Taylor approached Ms. Smith, Ms. Smith became more verbally agitated, pointed at Corporal Jones, and loudly said: "I'm going to kill your ass bitch . . . You ugly piece of shit . . . Suck my dick . . . I'm going to kill your mother fuckin' momma."  Ms. Smith's agitation increased.  She became physically restless and began speaking more quickly, saying such things as:  "Lucifer you ain't got shit; cuz I'm going to kill your momma today, bitch."  Officer Taylor, who stood

to the right of Ms. Smith, tried to interrupt, but Ms. Smith continued ranting.  At

19:55 on the recording from Officer Taylor's body camera, Ms. Smith spat in the

direction of the reception desk.  Nurse Drain and Aide Means, who were sitting at

the reception desk, and Corporal Smith, who was standing at the reception desk on

the opposite side of the room from Ms. Smith, remained calm and did not respond

to Ms. Smith.

As Ms. Smith continued to rant, Nurse Drain interjected and told Ms. Smith

that Officer Taylor had a question for her.  Ms. Smith then turned to Officer Taylor

and told Officer Taylor to "get the fuck out of my fuckin' face before I sock the

shit out you. . . . Bitch, I will kill you . . . Bitch, I will kill you . . . Bitch, I will kill

you."  Nurse Drain then asked Ms. Smith for her phone number.  In response, Ms.

Smith turned her attention to Nurse Drain and told Nurse Drain to "shut the fuck

up."  Ms. Smith then proceeded to rant at Nurse Drain, including saying that she

"outta come beat your punk white ass and slam your head in that goddam

computer."

At this point, Ms. Smith became visibly more agitated and called Nurse

Drain a "dick suckin' slut."  Then, at 20:50 on the recording from Officer Taylor's

body camera, Ms. Smith spat at Nurse Drain.  Nurse Drain flinched.  Up to this

point, Officer Jones had stood calmly on the other side of the reception desk, not

responding or engaging with Ms. Smith.  After Ms. Smith spat at Nurse Drain,

8

however, Corporal Jones calmly said "you know what" and walked around the reception desk toward Ms. Smith.  Contrary to Plaintiffs' claim, Corporal Jones' hands were not balled into a fist as he approached Ms. Smith.

While Corporal Jones was still several feet away from Ms. Smith, she suddenly jumped up from the chair, postured herself at an angle, and ranted loudly at Corporal Jones.  The sheet, at this point, had dropped from Ms. Smith.  Corporal Jones got closer, pointed his finger at Ms. Smith, and calmly commanded her several times to sit down.

Ms. Smith, while still standing, continued to curse at Corporal Jones.  Corporal Jones, who had stepped back slightly from Ms. Smith, remained calm.  His hands remained open, not balled into fists as Plaintiffs claim.  At this point, Corporal Jones had told Ms. Smith at least seven times to sit down.  Corporal Jones then gestured to Michael Hardemon, an officer employed by the Detroit Medical Center Police Authority and stationed at the Crisis Center, to assist with Ms. Smith.  (*See also* ECF No. 130-12 at PageID. 2049-50.)

Officer Hardemon was approaching the reception area from a room down the hallway when Corporal Jones requested his assistance.  Officer Hardemon testified that he came to the reception area in response to a "loud commotion" and a woman "yelling," which he described as "verbally violent."  (*Id.* at PageID. 2053, 2077.)  He went to the reception area to see what was happening and found a

"verbally combative" Ms. Smith, who was standing in an aggressive stance. (*Id.* at PageID. 2055-57, 2076-77, 2080.)  Officer Hardemon testified that it looked like Ms. Smith "was physically aggressive, as if she was about to attack." (*Id.* at PageID. 2080.)

When asked why he intervened, Officer Hardemon explained that patients brought into the hospital by DPD officers remain under the care of the DPD until they are admitted to the hospital. (*Id.* at PageID. 2054-55.)  However, if a patient becomes verbally or physically combative before they are admitted, he will get involved. (*Id.* at PageID. 2055-56.)

Officer Hardemon approached Ms. Smith, put his hand on her arm or shoulder, and told her to sit down.  Officer Hardemon then used his hand to push Ms. Smith back into the chair, which led to a struggle between them.  While this was happening, Ms. Smith continued yelling and cursing, and said, "I'll fuck you up, nigga."  While Ms. Smith and Officer Hardemon were struggling, Ms. Smith bit Officer Hardemon's arm and thigh. (*Id.* at 2057, 2062.)  Corporal Jones, who had not intervened up to this point, then calmly but firmly told Ms. Smith "to relax" and "to listen."  He then stepped in, as he retrieved handcuffs from his right side.  Ms. Smith spat at Corporal Jones. (*Id.* at PageID. 2066, 2079.)  Even after she spat at him, Corporal Jones continued to calmly and firmly tell Ms. Smith "to listen."

Ms. Smith then stood up again and began tussling with Officer Hardemon. Corporal Jones reached in with his left arm and grabbed Ms. Smith's left wrist. She bit his upper arm.  Two other officers approached and, along with Officer Hardemon, tried to gain control of Ms. Smith.  (*See also id*. at 2058.)  As the officers tried to restrain Ms. Smith, who was strongly resisting (*see also id*. at PageID. 2086), Corporal Jones tried to get Ms. Smith under control with several hand strikes, striking her several times on the back and side (*see also* ECF No. 130-9 at PageID. 1978).  A bystander, Cearia Morgan, captured this portion of the incident on her cell phone.

Ms. Morgan only started recording as Corporal Jones began striking Ms. Smith, and the interaction quickly moved outside her camera's view.  It appears that Corporal Jones struck Ms. Smith eight or nine times.  The videos do not show Corporal Jones striking Ms. Smith in the head or face.[2]

---

[2] Ms. Morgan testified that Corporal Jones punched Ms. Smith in the head (*see* ECF No. 137-12 at PageID. 2272); however, Ms. Morgan began videotaping the incident with her phone before Corporal Jones began striking Ms. Smith and no blows to Ms. Smith's head are visible on the cell phone recording—even when viewed in slow motion as Plaintiffs urge the Court to do.  When another DPD officer subsequently spoke with Ms. Smith, she reported only that Corporal Jones hit her in the back.  (ECF No. 137-6 at PageID. 2236.)  While a nurse who was standing next to the altercation can be heard telling Corporal Jones that he should not have hit Ms. Smith in the back, she said nothing about her head or face.  The nurse later testified about the strike to Ms. Smith's back and did not mention any blows to Ms. Smith's head or face.  (*See* ECF No. 137-11 at PageID. 2266.)

Ms. Smith continued to struggle with the officers, but Corporal Jones eventually gained some control of her by putting her in a bear-hug.  Two other officers, one of whom can be heard saying "we've got her," then took control of Ms. Smith and laid her on a hospital gurney which was sitting in the hallway off the reception area.  Ms. Smith, however, continued cursing and spitting.  Corporal Jones stepped away once the other officers gained physical control of her.  Other officers and/or hospital staff then restrained Ms. Smith on the gurney.

Citing to the video recordings from the hospital's hallway camera and Ms. Morgan's cellphone, Plaintiffs assert that Corporal Jones took several "gratuitous punches" at Ms. Smith after she was under the other officers' control.  (ECF No. 137 at PageID. 2207-08.)  The altercation was outside Ms. Morgan's view at this point, however, as reflected in the recording from her cell phone.  In the hallway video, Ms. Smith can be seen still struggling when Corporal Jones inflicted his final hand strike.  The video recordings from the Officers' body cameras also contradict Plaintiffs' version.  As the videos reflect, Ms. Smith continued to fight with the officers and spit, even after the other officers took her from Corporal Jones' grasp and Corporal Jones had stepped away.

There is no evidence of any injury to Ms. Smith from Corporal Jones' blows.  Ms. Smith told a DPD officer who investigated Corporal Jones' use of force after

the incident, but still on August 1, 2018, that she was not injured.  (ECF No. 137-6 at PageID. 2237.)  The investigator observed no physical signs of injury.  (*Id.*)

Plaintiffs cite to Nurse Drain's testimony and Ms. Smith's medical records to show that Ms. Smith was injured.  (ECF No. 137 at PageID. 2210.)  Nurse Drain testified to some redness on Ms. Smith's back and legs, however, she saw no "bleeding, bruising, or anything like that."  (ECF No. 150-7  at PageID. 2648-49.) The "medical record" to which Plaintiffs refer contains an "allegation" recorded apparently by Social Welfare Provider Lynn Burdell.  (ECF No. 137-15.)  It does not appear that Ms. Burdell had first-hand knowledge of what she noted in the medical record.  There is no indication that Burdell witnessed the incident or personally saw Ms. Smith immediately after/or any evidence of the injuries reported in her notes and it is unclear who the source was of the information she recorded.  As Defendants argue, this information is inadmissible hearsay which cannot be considered on summary judgment.  *See* Fed. R. Evid. 803(6) (allowing for the admission of a medical record as an exception to the hearsay rule if, among other requirements, "the record was made at or near the time by—or from information transmitted by—someone with knowledge"); *see also Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009) (explaining that hearsay must be disregarded on summary judgment).

### III.    Applicable Law & Analysis

### A.    Section 1983 & Qualified Immunity

Section 1983 creates a private right of action against a state official who deprives an individual of his or her constitutional rights under color of state law. 42 U.S.C. § 1983.  Civil liability does not attach simply because a court determines that an official's actions were unconstitutional, however.  Qualified immunity shields federal and state officials from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

### 1.    Excessive Force – Corporal Jones

Law enforcement officers run afoul of the Fourth Amendment by using excessive force "in the course of an arrest, investigatory stop, or other seizure." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Whether excessive forced was used is assessed under "an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)); *see also Graham*, 490 U.S. at 396. The assessment is made "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397.  Reasonableness is "judged from the

14

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and takes into account that police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Reasonable does not mean vindicated by hindsight." *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020) (citing *Graham*, 490 U.S. at 396).

Generally, "[t]hree important but non-exhaustive factors guide [the excessive force] analysis: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006)). "Throughout the inquiry, [the court] must carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396). The Sixth Circuit has indicated, however, that the three factors set forth above (i.e., the "*Graham* factors") are non-exhaustive, "[t]he ultimate question . . . is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Id.* (quoting *St. John v.*

*Hickey*, 411 F.3d 762, 768 (6th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985))).

In fact, the Sixth Circuit has indicated that the *Graham* factors are not necessarily the correct factors in all scenarios. *Estate of Hill by Hill v. Miracle*, 855 F.3d 306, 312-13 (2017). For example in *Hill*, where an officer tased "a combative and disoriented diabetic suffering from a hypoglycemic episode," to allow for emergency medical technicians to administer dextrose to him, the Sixth Circuit found that "applying the *Graham* factors to the situation that [the officer] faced is equivalent to a baseball player entering the batter's box with two strikes already against him." *Id.* at 313. This was because the diabetic "had not committed a crime and was not resisting arrest" and so "two of the three *Graham* factors automatically weighed against [the officer]." *Id.*

The Sixth Circuit panel in *Hill* found the case before it most comparable to *Caie v. West Bloomfield Township*, 485 F. App'x 92 (6th Cir. 2012), where the *Graham* factors were not used to assess the reasonableness of an officer's tasing of an individual who was "depressed, intoxicated, and suicidal," had tried to drown himself in a lake, and then refused to go to the hospital. *Id.* at 94. When the individual "began to run and flail his arms violently," and then refused to put his hands behind his back to be handcuffed, the officer tased him. *Id.* The Sixth Circuit found that the officer did not violate the individual's constitutional rights,

16

reasoning that the circumstances "could lead reasonable officers to conclude that he was a threat to officer safety or, at least, his own safety.  *Id.* at 96.  The court further reasoned that the use of the taser "was not gratuitous" but "served the purpose of gaining control over" a subject who was "actively resisting the officers' attempts" to control him.  *Id.* at 97.

In *Hill*, the Sixth Circuit offered "a more tailored set of factors" for courts to consider in the medical-emergency context, "always aimed towards the ultimate goal of determining 'whether the officers' actions are objectively reasonable in light of the circumstances confronting them.'"  853 F.3d at 314 (quoting *Graham*, 490 U.S. at 397).  Where the individual against whom force was used "ha[d] not committed a crime, [wa]s not resisting arrest, and [wa]s not directly threatening the officer," the court suggested that the following questions might be useful in assessing reasonableness:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
>
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
>
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

*Id.*

The Sixth Circuit indicated that "[i]f the answers to the first two questions are 'yes,' and the answer to the third question is 'no,' then the officer is entitled to qualified immunity." *Id.*  But like the *Graham* factors, the court advised that these questions are "non-exhaustive" and "not necessarily dispositive in every case." *Id.*

In the present case, Ms. Smith was experiencing a mental health emergency, and she was incapable of making rational decisions.  Plaintiffs suggest that Corporal Jones provoked Ms. Smith by walking towards her with clenched fists.  However, the videos do not support Plaintiffs' assertion that Corporal Jones' fists were clenched, and they reflect that Ms. Smith was agitated at various points well before Corporal Jones moved from the far side of the reception desk toward Ms. Smith.

By the time Corporal Jones approached Ms. Smith, she had already threatened physical harm to several individuals in the reception area, including just stating that she should slam Nurse Drain's head into the computer, and had spat at Nurse Drain.  Thus, contrary to Plaintiffs' recitation (*see* ECF No. 137 at PageID. 2205), Ms. Smith had not been only verbally ranting when Corporal Jones decided to intervene.  Corporal Jones did not, as Plaintiffs claim, confront Ms. Smith in a threatening manner.  He was calm and simply instructed Ms. Smith, albeit in a stern voice, to sit and calm down.

Ms. Smith did not comply with Corporal Jones' repeated verbal commands. She spat at him.  Even then, Corporal Jones did not respond with force.  Instead, he requested Officer Hardemon's assistance. It was only after Ms. Smith bit Officer Hardemon on the arm and thigh, bit Corporal Jones, and aggressively resisted Officer Hardemon and several other officers that Corporal Jones struck Ms. Smith. Officers are trained to use physical hard empty hand controls, such as strikes, in response to active resistance and aggression.  (*See* ECF Nos. 130-5, 130-6 at PageID. 1898.)

Ms. Smith's resistance by the time this force was used against her far exceeded that of the plaintiff in *Caie*, and was at least comparable to the resistance of the plaintiff in *Hill*.  On the force continuum, the force used by Officer Jones fell below the taser used by the officers in *Caie* and *Hill*.  (*See* ECF Nos. 130-5, 130-6.)

Plaintiffs argue that Nurse Drain and Aide Means did not personally feel threatened by Ms. Smith.  Nurse Drain and Aide Means did testify that they did not feel threatened by Ms. Smith's verbal rantings.  (ECF No. 137-7 at PageID. 2242; ECF No. 137-10 at PageID. 2257-59.)  However, Nurse Drain could not recall whether she felt physically threatened by Ms. Smith at any time.  (ECF No. 137-7 at PageID. 2242.)  And, while Aide Means testified that "at the time" she did not feel physically threatened by Ms. Smith, Aide Means indicated that the situation

19

later escalated.  (*Id*. at 2258-59.)  Notably, when Ms. Smith quickly stood up as Corporal Jones approached her, Nurse Drain visibly flinched, stood up, and stepped away from her.  The Court notes that the presence of several DPD officers in the reception area also must be considered when assessing any contention that the hospital staff did not feel threatened by Ms. Smith.

Plaintiffs also point to the unidentified nurse's criticism of Corporal Jones' use of force.  That nurse, however, was not present during the entire encounter and thus was not aware of the "totality of the circumstances."[3]  She also is not an expert on the appropriate use of police officer force.  Finally, the reasonableness of Corporal Jones' actions is judged "from the perspective of a reasonable *officer* on the scene."  *Graham*, 490 U.S. at 396 (emphasis added).  Thus, what this nurse believed was reasonable is not persuasive.

No reasonable juror, viewing the totality of the circumstances, even in the light most favorable to Plaintiffs, could find that Corporal Jones' use of force was objectively unreasonable.  But even if a juror could find the use of force objectively unreasonable, the Court finds that it was not clearly established that the use of such force under the circumstances presented was unconstitutional.

---

[3] Similarly, the brief video taken by Ms. Morgan fails to present the totality of the circumstances leading to Corporal Jones' use of force.

Therefore, the Court concludes that he is entitled to summary judgment on Plaintiffs' Fourth Amendment excessive force claim.

### 2.   Excessive Force – Officer Taylor

Plaintiffs claim Officer Taylor violated Ms. Smith's Fourth Amendment rights by failing to intervene to prevent Corporal Jones' use of force.  As the Court concludes that Corporal Jones did not use excessive force against Ms. Smith, Officer Taylor is entitled to summary judgment on this claim, as well.  But even if Corporal Jones used excessive force against Ms. Smith, Officer Taylor would be entitled to summary judgment.

To hold Officer Taylor liable on a failure-to-intervene theory, Plaintiffs must show that Officer Taylor "observed or had reason to know that excessive force would be or was being used" and "had both the opportunity and the means to prevent the harm from occurring." *Goodwin*, 781 F.3d at 328 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  There is no evidence from which a reasonable juror could conclude that Officer Taylor was on notice that Corporal Jones was going to use hand strikes on Ms. Smith.  Further, a review of the video from Officer Taylor's body camera reflects that she was not in a position to intervene.

### 3.    First Amendment Retaliation

To prove their First Amendment retaliation claim, Plaintiffs must show: "(1) [that Ms. Smith] engaged in protected conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [Ms. Smith]'s protected conduct." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). The Officers assert that Plaintiffs' claim fails because Ms. Smith was not engaged in "protected conduct" as her speech constituted unprotected threats and fighting words and because force was used against Ms. Smith, not because of her speech, but because she began physically assaulting and battering officers and other individuals in the reception area.

Plaintiffs do not directly address the Officers' arguments in their response briefs. They acknowledge that Ms. Smith's speech was "delusional" and that she was "ranting and raving." (*See, e.g.*, ECF No. 137 at PageID. 2219.) They do not explain how such speech is "protected" by the First Amendment. "True threats" and vulgar, and offensive speech are not protected.[4]  *United States v. Landham*,

---

[4] "True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023)

251 F.3d 1017, 1080-81 (6th Cir. 2001) (citations omitted).  Further, there is no

evidence to show that Corporal Jones' use of force was motivated to any extent by

Ms. Smith's speech, as opposed to her physical aggression, including her biting

and spitting.

The Officers are entitled to summary judgment with respect to Plaintiffs'

First Amendment retaliation claim.

### 4.   Municipal Liability

As Ms. Smith suffered no constitutional harm, the City is entitled to

summary judgment with respect to Plaintiffs' § 1983 claim, as well.  "There must

be a constitutional violation for a § 1983 claim against a municipality to succeed—

if the plaintiff has suffered no constitutional injury, h[er] *Monell* claim fails."

*North v. Cuyahoga Cnty.*, 754 F. App'x 380, 389 (6th Cir. 2018); *see also Puskas*

*v. Delaware Cnty.*, 56 F.4th 1088, 1099 (6th Cir. 2023) (explaining that "[a]n

underlying constitutional violation is the *sine qua non* of municipal liability, which

---

(cleaned up).  Such threats are distinguishable from "jests, hyperbole, or other
statements that when taken in context do not convey a real possibility that violence
will follow (say, 'I am going to kill you for showing up late.')."  *Id*. (additional
quotation marks and citation omitted).  Relevant to the present case, "[w]hether the
speaker is aware of, and intends to convey, the threatening aspect of the message is
not part of what makes a statement a threat . . ..  The existence of a threat depends
not on "the mental state of the author," but on "what the statement conveys" to the
person on the other end."  *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 733
(2015)).

requires that the constitutional violation was caused by a municipal policy or custom").

### B.     State-Law Claims

Plaintiffs assert assault and battery and gross negligence claims against the Officers.  Corporal Jones seeks summary judgment with respect to these claims, arguing that he is entitled to immunity under two Michigan statutes: the governmental immunity from tort liability act and the mental health code, Mich. Comp. Laws §§ 691.1407 and 330.1427a, respectively.  Further, with respect to Plaintiffs' gross negligence claim, Corporal Jones argues that such a claim cannot be premised on an intentional tort.  Officer Taylor argues that she is entitled to summary judgment because she did not use any force against Ms. Smith.

Section 691.1407 provides government employees and others with immunity from intentional torts when these conditions are met: "(1) the acts were taken during the course of employment and the employees were acting, or reasonably believed that they were acting, within the scope of their authority, (2) the acts were taken in good faith, and (3) the acts were discretionary-decisional, as opposed to ministerial-operational."  *King v. City of Rockford*, 97 F.4th 379, 399 (6th Cir. 2024) (quoting *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 222 (Mich. 2008)).  "The good-faith prong protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with

24

malicious intent." *Id*. at 399-400 (quoting *Odom*, 760 N.W.2d at 229).  This

element is subjective.  *Id*. at 400.  Thus, an officer who believed in good faith that

the force used was necessary is protected from liability for an assault and battery

claim; whereas, an officer who acted with malicious intent is not.  *Bletz v. Gribble*,

641 F.3d 743, 757 (6th Cir. 2011) (citing *Odom*, 760 n.W.2d at 229).

Section 330.1427a provides that an officer taking an individual into

protective custody "may use that kind and degree of force that would be lawful if

the peace officer were effecting an arrest for a misdemeanor without a warrant."

Mich. Comp. Laws § 330.1427a(1).  The officer may also "take reasonable steps

for self-protection."  *Id*.  Transporting an individual who an officer believes

requires treatment to a hospital's preadmission screening unit constitutes "taking

into protective custody."  *Id*. § 330.1427a(2).

For the reasons already discussed, the force used by Corporal Jones was

reasonable as a matter of law.  Thus, he is entitled to summary judgment with

respect to Plaintiffs' assault and battery and gross negligence claims.  *See Hill*, 853

F.3d at 318 (concluding that the defendant is entitled to governmental immunity on

the plaintiff's state-law claim of assault and battery because the record reflected

that the defendant "acted in an objectively reasonable manner with the minimum

force necessary to bring [the plaintiff] under control"); *Estate of Sowards v. City of

Trenton*, 125 F. App'x 31, 43 (6th Cir. 2005) (concluding that the plaintiff's gross

negligence and assault and battery claims could not stand because "the officers' use of force . . . was reasonable and justified"); *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640-41 (6th Cir. 2013) (citing Michigan law and explaining that "if a police officer's actions are objectively reasonable under the circumstances, he cannot be held liable for assault and battery [or gross negligence] under Michigan tort law"). Moreover, Plaintiffs' gross negligence claim cannot be premised on Corporal Jone's alleged assault and battery of Ms. Smith. *See Wells*, 538 F. App'x at 641. "Michigan courts have repeatedly 'rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'" *Id*. (quoting *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004)).

For these reasons, Corporal Jones is entitled to summary judgment with respect to Plaintiffs' state-law claims of assault and battery and gross negligence. Officer Taylor is entitled to summary judgment for the same reasons, and because she did not personally use force against Ms. Smith. To the extent a failure-to-intervene theory is viable to prove these state-law claims, Officer Taylor still would not be liable for the reasons discussed earlier.

## IV.   Conclusion

Plaintiffs abandoned their intentional infliction of emotional distress and PWDCRA claims in response to Defendants' summary judgment motions. For the

26

reasons discussed, the Court concludes that Defendants are entitled to summary judgment with respect to Plaintiffs' remaining claims.

Accordingly,

**IT IS ORDERED** that Defendant Jones' motion for summary judgment (ECF No. 130) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Taylor and the City of Detroit's motion for summary judgment (ECF No. 146) is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: October 25, 2024

27